Given
Patent
Form

1    John D. Klinedinst, Bar No. 86254
2    Gregor A. Hensrude, Bar No. 226660
    KLINEDINST PC
3    777 S. Figueroa St., 47th Floor
    Los Angeles, California 90017
4    (213) 607-2115/FAX (213) 607-2116
    ghensrude@klinedinstlaw.com
5
    Edward E. Casto, Jr., Esq.
6    Barry J. Bumgardner, Esq.
    Edward R. Nelson, III, Esq.
7    Steven W. Hartsell, Esq.
    NELSON BUMGARDNER CASTO, P.C.
8    5601 Bridge Street, Suite 300
    Forth Worth, Texas 76112
9    817-377-9111/FAX 817-377-3485
    ecasto@nbclaw.com
10   shartsell@nbclaw.net

11   Attorneys for Plaintiff
    GUARDIAN MEDIA TECHNOLOGIES,
12   LTD.

13           **UNITED STATES DISTRICT COURT**

14           **CENTRAL DISTRICT OF CALIFORNIA**

15

16   GUARDIAN MEDIA
    TECHNOLOGIES, LTD.,
17
           Plaintiff,
18
         v.
19
    APEX DIGITAL, INC.; AT&T, INC.;
20   BENQ AMERICA CORPORATION;
    DIGITAL PRODUCTS
21   INTERNATIONAL; FUJITSU
    COMPUTER SYSTEMS
22   CORPORATION; FUJITSU
    LIMITED; HAIER AMERICA
23   TRADING, LLC; HISENSE USA
    CORPORATION; HYUNDAI IT
24   AMERICA CORP.; KONKA GROUP
    CO., LTD.; LASONIC
25   ELECTRONICS CORPORATION;
    LODGENET INTERACTIVE
26   CORPORATION; LOEWE AG; ON
    CORP US; PROTON
27   INTERNATIONAL AMERICA, INC.;
    PROTRON DIGITAL
28   CORPORATION; THE ROTEL CO.,
    LTD; RUNCO INTERNATIONAL,

**CV09-02733 DSF (Ex)**

Case No.

**COMPLAINT**

Date
Time:
Courtroom:
Judge:
Magistrate Judge:
Complaint Filed:
Trial Date:      None set

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

**COMPLAINT**

1  LLC; STARLITE CONSUMER
   ELECTRONICS (USA) INC.;
2  STARLITE INTERNATIONAL
   HOLDINGS, LTD., SKYWORTH
3  ELECTRONICS, INC.; SOYO, INC.;
   TATUNG COMPANY OF
4  AMERICA, INC.; VERIZON
   COMMUNICATIONS, INC. ;
5  ZIAMEN OVERSEAS CHINESE
   ELECTRONIC COMPANY,
6
7              Defendants.
8

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

9      Plaintiff Guardian Media Technologies, Ltd. files this Original Complaint against

10  the above-named Defendants, alleging as follows:

11                              **I.**

12                      **THE PARTIES**

13     1.     Plaintiff Guardian Media Technologies, Ltd. ("Guardian") is a Texas

14  Limited Partnership. Guardian has a mailing address at 3801 N. Capital of Texas

15  Highway, E240-303, Austin, Texas 78746.

16     2.     Defendant Apex Digital, Inc. ("Apex") is a corporation organized and

17  existing under the laws of the State of California with its principal place of business

18  located at 301 Brea Canyon Road, Walnut, California 91789. Apex can be served via its

19  registered agent for service of process: David Ji, 301 Brea Canyon Road, Walnut,

20  California 91789.

21     3.     Defendant AT&T, Inc. ("AT&T") is a corporation organized and existing

22  under the laws of the State of Delaware with its principal place of business located at 175

23  E. Houston, San Antonio, Texas 78205-2233. AT&T can be served via its registered

24  agent for service of process: The Corporation Trust Company, Corporation Trust Center,

25  1209 Orange Street, Wilmington, Delaware 19801.

26     4.     Defendant BenQ America Corporation ("BenQ") is a corporation organized

27  and existing under the laws of the State of California with its principal place of business

28  located at 15375 Barranca Parkway, Suite A-205, Irvine, California, 92618. BenQ can be

                              - 1 -

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1  served via its registered agent for service of process: CT Corporation System, 818 West

2  Seventh Street, Los Angeles California 90017.

3       5.    Defendant Digital Products International ("DPI") is a corporation organized

4  and existing under the laws of the State of Missouri with its principal place of business

5  located at 900 North 23rd Street, St. Louis, Missouri 63106. DPI can be served via its

6  registered agent for service of process: Paul Green, 900 North 23rd Street, St. Louis,

7  Missouri 63106.

8       6.    Defendant Fujitsu Computer Systems Corporation ("Fujitsu Computer") is

9  a corporation organized and existing under the State of California with its principle place

10  of business located at 1250 East Arques Avenue, MS122, Sunnyvale, California 94085.

11  Fujitsu America can be served via its registered agent of process: Corporation System,

12  2730 Gateway Oaks Drive, Suite 100, Sacramento, California 95833.

13       7.    Defendant Fujitsu Limited ("Fujitsu") is a corporation organized and

14  existing under the laws of Japan with its principal place of business located at Shiodome

15  City Center, 1-5-2 Higashi-Shimbashi, Minato-ku, Tokyo 105-7123, Japan.

16       8.    Defendant Haier America Trading, LLC ("Haier") is a limited liability

17  company organized and existing under the laws of the State of New York with its

18  principal place of business located at 1356 Broadway, New York, New York 10018.

19  Haier can be served via its registered agent for service of process: Michael Jemal, 1356

20  Broadway, New York, New York 10018.

21       9.    Defendant Hisense USA Corporation ("Hisense") is a corporation

22  organized and existing under the laws of the State of Georgia with its principal place of

23  business located at 101 Satellite Blvd., N.W., Suite A, Suwanee, Georgia 30024. Hisense

24  can be served via its registered agent for service of process: Lin Lan, 105 Satellite

25  Boulevard, N.W., Suite A, Suwanee, Georgia 30024.

26       10.   Defendant Hyundai IT America Corp ("Hyundai") is a corporation

27  organized and existing under the laws of the State of California with its principal place of

28  business located at 2051 Junction Avenue, Suite 112, San Jose CA 95131. Hyundai can

COMPLAINT

1   be served via its registered agent for service of process: James Park, 205 Junction

2   Avenue, Suite 137, San Jose, California 95131.

3       11.    Upon information and belief, Defendant Konka Group Co., Ltd. ("Konka")

4   is a corporation organized and existing under the laws of China with its principal place of

5   business located at Overseas Chinese Town, Shenzhen, Guangdong, P.R. China 518053.

6       12.    Defendant Lasonic Electronics Corporation ("Laconic") is a corporation

7   organized and existing under the laws of the State of California with its principal place of

8   business located at 15759 Tapia Street, Irwindale, California 91706. Laconic can be

9   served via its registered agent for service of process: Albert Chen, 15759 Tapia Street,

10   Irwindale, California 91706.

11       13.    Defendant LodgeNet Interactive Corporation ("LodgeNet") is a corporation

12   organized and existing under the laws of the State of Delaware with its principal place of

13   business located at 3900 W. Innovation Street, Sioux Falls, South Dakota 57107.

14   LodgeNet can be served via its registered agent for service of process: Prentice-Hall

15   Corporation System, 2730 Gateway Oaks Drive, Suite 100, Sacramento, California

16   95833.

17       14.    Upon information and belief, Defendant Loewe AG ("Loewe") is a

18   corporation organized and existing under the laws of Germany with its principal place of

19   business located at Industriestrasse 11, 96317 Kronach, Germany.

20       15.    Defendant On Corp US ("On Corp") is a corporation organized and

21   existing under the laws of the State of Delaware with its principal place of business

22   located at Parkwood Crossing, 450 East, 96th Street, Suite 500, Indianapolis, Indiana

23   46240. On Corp can be served via its registered agent for service of process: The

24   Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington,

25   Delaware 19801.

26       16.    Defendant Proton International America, Inc. ("Proton") is a corporation

27   organized and existing under the laws of the State of California with its principal place of

28   business located at 2540 Corporate Place. Suite B111, Monterey Park, California 91754.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1  Proton can be served via its registered agent for service of process: Michael Chen, 2450

2  Corporate Place, Suite B111, Monterey Park, California 91754.

3      17.    Defendant Protron Digital Corporation ("Protron") is a corporation

4  organized and existing under the laws of the State of California with its principal place of

5  business located at 3257 East Guasti Road, Suite 320, Ontario, California, 91761.

6  Protron can be served via its registered agent for service of process: Leo Chen, 3257 East

7  Guasti Road, Suite 320, Ontario, California, 91761.

8      18.    Upon information and belief, Defendant The Rotel Co., Ltd. ("Rotel") is a

9  corporation organized and existing under the laws of China with its principal place of

10  business located at Bunzan-Shinsen-Bldg. 4F, 10-10 Shinsen-Cho, Shibuya-Ku, Tokyo

11  150, Japan.

12      19.    Defendant Runco International, LLC ("Runco") is a corporation organized

13  and existing under the laws of the State of Oregon with its principal place of business

14  located at 1195 NW Compton Drive, Beaverton, Oregon 97006. Runco can be served via

15  its registered agent for service of process: AW Services, Inc., Ater Wynne LLP, 1331

16  NW Lovejoy Street, Suite 900, Portland, Oregon 97209.

17      20.    Upon information and belief, Defendant Starlite Consumer Electronics

18  (USA) Inc. ("Starlite") is a Hong Kong registered business with its principal place of

19  business located at 5/F., Shing Dao Industrial Building, 232 Aberdeen Main, Aberdeen,

20  Hong Kong.

21      21.    Upon information and belief, Defendant Starlite International Holdings,

22  Ltd. ("Starlite Holdings") is a Bermuda corporation with its principal place of business

23  located at 5/F., Shing Dao Industrial Building, 232 Aberdeen Main, Aberdeen, Hong

24  Kong.

25      22.    Defendant Skyworth Electronics, Inc. ("Skyworth") is a corporation

26  organized and existing under the laws of the State of California with its principal place of

27  business located at 1312 John Reed Court, City of Industry, California 91745. Skyworth

28  ///

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

- 4 -

1  can be served via its registered agent for service of process: Jianguo Chen, 256 Grand

2  Oaks Drive, Glendora, California 91741.

3      23.    Defendant Soyo, Inc. ("Soyo") is a corporation organized and existing

4  under the laws of the State of Nevada with its principal place of business located at 1290

5  East Elm Street, Ontario, California 91761.  Soyo can be served via its registered agent

6  for service of process: National Registered Agents, Inc., 2875 Michelle Dr., Suite 100,

7  Irvine, California 92606.

8      24.    Defendant Tatung Company of America, Inc. ("Tatung") is a corporation

9  organized and existing under the laws of the State of California with its principal place of

10  business located at 2850 El Presidio Street, Long Beach, California 90810. Tatung can be

11  served via its registered agent for service of process: Andrew L. Sun, 2850 El Presidio

12  Street, Long Beach, California 90810.

13      25.    Defendant Verizon Communications, Inc. ("Verizon") is a corporation

14  organized and existing under the laws of the State of Delaware with its principal place of

15  business located at 140 West Street, New York, New York 10007.  Verizon can be served

16  via its registered agent for service of process: The Corporation Trust Company,

17  Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

18      26.    Upon information and belief, Defendant Xiamen Overseas Chinese

19  Electronic Company ("Xoceco") is a corporation organized and existing under the laws

20  of China with its principal place of business located at No. 22 Huli Dadao, Xiamen,

21  Fujian, P. R. China.

22                          **II.**

23                  **JURISDICTION AND VENUE**

24      27.    This is an action for infringement of a United States patent arising under 35

25  U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject matter

26  jurisdiction of the action under Title 28 U.S.C. §1331 and §1338(a).

27      28.    The Court has personal jurisdiction over each Defendant, and venue is

28  proper pursuant to 28 U.S.C. §§ 1391 and 1400(b).

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

29.     Each Defendant has substantial contacts with the forum as a result of pervasive business activities conducted within the State of California and within this District, including but not limited to the manufacture, sale, and/or distribution of DVD players, televisions, and/or computers capable of playing DVDs and/or receiving television and/or video programs.

30.     Each Defendant has committed acts of patent infringement, directly and/or through agents and intermediaries, by shipping, distributing, importing, offering for sale, and/or selling certain infringing products in California and, particularly, the Central District of California.

31.     Each Defendant has purposefully and voluntarily placed one or more of its infringing products into the stream of commerce with the expectation that they will be purchased by consumers in the Central District, who in turn use the products in an infringing manner in this District.

### III.

### PATENT INFRINGEMENT

32.     On May 29, 1990, United States Patent No. 4,930,158 ("the '158 patent") was duly and legally issued by the United States Patent and Trademark Office for an invention entitled "Selective Video Playing System." A true and correct copy of the '158 patent is attached hereto as Exhibit A. The '158 patent is expired.

33.     On November 4, 2008, the United States Patent and Trademark Office issued a Reexamination Certificate for the '158 patent, which confirmed the patentability of Claims 8-11 and 19-22 of the '158 patent. A true and correct copy of this Reexamination Certificate is attached hereto as Exhibit B.

34.     On May 29, 1990, United States Patent No. 4,930,160 ("the '160 patent") was duly and legally issued by the United States Patent and Trademark Office for an invention entitled "Automatic Censorship of Video Programs." A true and correct copy of the '160 patent is attached hereto as Exhibit C. The '160 patent is expired.

///

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1    35.    On December 4, 2008, the United States Patent and Trademark Office

2    issued a Notice of Intent to Issue Ex Parte Reexamination Certificate in connection with

3    reexamination proceedings concerning the '160 patent, confirming the patentability of

4    Claims 3, 6-7, 16, and 19-20 of the '160 patent. A true and correct copy of this Notice of

5    Intent to Issue Ex Parte Reexamination Certificate is attached hereto as Exhibit D.

6    36.    Guardian owns the entire right, title, and interest in and to the '158 and

7    '160 patents.

8    37.    As it pertains to this lawsuit, the '158 patent generally relates to parental

9    control features contained in DVD players offered for sale by Defendants that allow

10   owners of the players to restrict the types of DVDs viewed by others.

11   38.    As it pertains to this lawsuit, the '160 patent generally relates to parental

12   control features contained in televisions offered for sale by Defendants that allow owners

13   of televisions to restrict viewing of certain movies and other video content based on the

14   particular program's rating for all televisions and monitors over 13 inches. See 47 C.F.R.

15   15.120.

16   39.    Prior to the expiration of the patents-in-suit, Defendants Apex, AT&T,

17   Fujitsu, Fujitsu Computer, Haier, Hyundai, LodgeNet, Rotel, and Verizon directly or

18   through intermediaries, made, had made, used, imported, provided, supplied, distributed,

19   sold, and/or offered for sale products and/or systems that infringed or, when used,

20   infringed one or more claims of the '158 patent. In addition, Defendants induced

21   infringement and/or contributed to the infringement of one or more of the claims of the

22   '158 patent by others.

23   40.    Prior to the expiration of the patents-in-suit, Defendants BenQ, Haier,

24   Hisense, Hyundai, Konka, Laconic, Loewe, On Corp, Proton, Protron, Runco, Skyworth,

25   Starlite, Soyo, Tatung, and XOCECO directly or through intermediaries, made, had

26   made, used, imported, provided, supplied, distributed, sold, and/or offered for sale

27   products and/or systems that infringed or, when used, infringed one or more claims of the

28   ///

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

- 7 -

1    '160 patent. In addition, Defendants induced infringement and/or contributed to the

2    infringement of one or more of the claims of the '160 patent by others.

3      41.    Guardian has been damaged as a result of Defendants' infringing conduct.

4    Defendants are, thus, liable to Guardian in an amount that adequately compensates it for

5    their infringements, which, by law, cannot be less than a reasonable royalty, together with

6    interest and costs as fixed by this Court under 35 U.S.C. § 284.

7      42.    Upon information and belief, Defendants' infringements were deliberate

8    and with full knowledge of the '158 and '160 patents. Defendants' infringements were

9    willful from the time Defendants became aware of the '158 patent, the '160 patent, and

10    due to the infringing nature of their respective activities, Guardian is entitled to increased

11    damages (up to three times) for the period of such willful infringement pursuant to 35

12    U.S.C. § 284.

**IV.**

**JURY DEMAND**

15    Guardian hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules

16    of Civil Procedure.

**V.**

**PRAYER FOR RELIEF**

19    Guardian requests that the Court find in its favor and against Defendants, and that

20    the Court grant Guardian the following relief:

21      a.    Judgment that one or more claims of United States Patent No. 4,930,158

22    and/or 4,930,160 have been infringed, either literally and/or under the doctrine of

23    equivalents, by one or more Defendants and/or by others to whose infringement

24    Defendants have contributed and/or by others whose infringement has been induced by

25    Defendants;

26      b.    Judgment that Defendants account for and pay to Guardian all damages to

27    and costs incurred by Guardian because of Defendants' infringing activities and other

28    conduct complained of herein;

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

- 8 -

1      c.      That, to the extent Defendants have had knowledge of their infringing

2 activities, Defendants' infringements be found to be willful from the time that Defendants

3 became aware of the infringing nature of their respective activities, and that the Court

4 award treble damages for the period of such willful infringement pursuant to 35 U.S.C. §

5 284;

6      d.      That Guardian be granted pre judgment and post-judgment interest on the

7 damages caused by Defendants' infringing activities and other conduct complained of

8 herein;

9      e.      That this Court declare this an exceptional case and award Guardian its

10 reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

11      f.      That Guardian be granted such other and further relief as the Court may

12 deem just and proper under the circumstances.

13

14                         KLINEDINST PC

15

16 DATED: April 20, 2009         By: _____

17                                  Gregor A. Hensrude

                                     Attorneys for Plaintiff

18                                  GUARDIAN MEDIA

                                    TECHNOLOGIES, LTD.

19 767362v1

20

21

22

23

24

25

26

27

28

- 9 -

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

# Exhibit "A"

# United States Patent [19]

## Vogel

[11]   **Patent Number:**    **4,930,158**

[45]   **Date of Patent:**    **May 29, 1990**

[54]   **SELECTIVE VIDEO PLAYING SYSTEM**

[76]   Inventor:   Peter S. Vogel, 28 Adeline St.,
Faulconbridge, NSW 2776, Australia

[21]   Appl. No.:   **237,175**

[22]   Filed:      **Aug. 29, 1988**

[30]        **Foreign Application Priority Data**

Sep. 2, 1987 [AU]   Australia ................................ PI4107

[51]   **Int. Cl.⁵** ............................................... H04N 7/16
[52]   **U.S. Cl.** ........................................... 380/5; 380/20;
380/23; 358/349
[58]   **Field of Search** ....................... 380/3, 5; 358/349;
340/825.31, 825.34

[56]              **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,225,884 | 9/1980 | Block et al. ........................... | 380/20 |
| 4,528,588 | 7/1985 | Löfberg .............................. | 358/349 |
| 4,595,950 | 6/1986 | Löfberg .................................. | 380/5 |
| 4,670,857 | 6/1987 | Rackman ........................... | 380/5 X |

OTHER PUBLICATIONS

Rae Atkey, "How You Can Censor Your Child's TV Viewing", The News Editorial (Adelaide) 8/25/1986.

Primary Examiner—Stephen C. Buczinski
Assistant Examiner—Bernarr Earl Gregory

[57]            **ABSTRACT**

A classification code, recorded repeatedly along with program material, is recovered on playing a video recording, and used to inhibit replay if the recovered code matches any of a set of codes specified by the user. The codes which cause replay to be inhibited can be set by the user after entering a personal identity number. The user can optionally request that a code be recorded when recording a program. Signals are optionally provided so that an auxiliary device, such as a second video player, can be controlled in response to codes recovered. One application is to prevent children viewing certain video recordings without parental permission.

22 Claims, 5 Drawing Sheets





Fig. 1

**U.S. Patent**        May 29, 1990        Sheet 2 of 5        **4,930,158**



Fig. 2

U.S. Patent    May 29, 1990    Sheet 3 of 5    4,930,158



Fig. 3

**U.S. Patent**   May 29, 1990   Sheet 4 of 5   **4,930,158**



Fig. 4

AUXILIARY CONTROL



Fig. 5

4,930,158

**1**

## SELECTIVE VIDEO PLAYING SYSTEM

### FIELD OF THE INVENTION

The present invention relates to methods of, and apparatus for, controlling the playing of video programs recorded on tape or other storage medium. The term video program also includes an accompanying audio signal if any.

### BACKGROUND OF THE INVENTION

With the ready availability of video tape recordings and domestic equipment upon which they can be played, there is a need to restric access of certain groups of people to certain classes of program. For example it might be desired to prevent children viewing certain classes of material, for example pornographic or violent movies. Traditionally, such security needs have been addressed by physically preventing unauthorized persons from having access to restricted recordings. This method is becoming less practical as the availability of both videotapes and machines to play them increases. For example, parents who wish to have pornographic videotapes in the home, for adult viewing only, risks a child finding the tape and playing it in the parent' absence.

It is therefore desirable to provide means whereby display of preselected classifications of program material can be viewed only by authorized persons.

Arrangements for making video programs available to only authorised viewers have long been used in the context of subscription television services and the like. These schemes commonly use a form of scrambling to make the signal unintelligible except to authorized persons in possesion of appropriate un-scrambling means. While it would be possible to apply similar techniques to video programs, for example scrambling pornographic movies, this would have the undesired consequence of rendering these tapes unusable to all persons who do not have special replay means. For many purposes, such as the domestic situation cited above, it is desirable that in the default condition, that is when using standard equipment, the tape plays normally. This means that a specially equipped tape player is only required if it is desired to take advantage of the restricted viewing capability.

Prior-art video security means have also been directed to providing control of viewer access by the party from whom the program originates. This is not always satisfactory, for example in the case of parental control of children's viewing, it is desirable that the parent, rather than the publisher or supplier of the video tape, be able to select whether a given tape will be viewable or not.

### SUMMARY OF THE INVENTION

The present invention is directed to providing novel and improved means and method of controlling the playing of video recordings whereby authorised persons can select which classifications of material can be viewed.

According to a first aspect of the present invention, there is provided a video recording playing method comprising the steps of replaying a video program, recovering from the replayed signal a classification code accompanying the recording, comparing the recovered classification signal to a set of user-selected classifications, and depending on the result of this comparison, causing the replay of the program to be suspended or terminated.

According to a second aspect of this inventive concept, apparatus for playing a video recording is provided, comprising video recording replay means, classification code detector means, a comparator equipped to compare the recovered classification code to a set of user-selected classifications, and a controller capable of causing suspension or termination of replay on detection at the output of the comparator a signal indicating equality between the recovered classification code and a set of user-selected classifications.

Some embodiments of this invention also include an arrangement for enabling access to selection of classifications which are to cause suspension or termination of replay only after entering a security code, or personal identification number (PIN), by the user.

In the case of commercially pre-recorded video tapes, the classification code is recorded before distribution to the consumer, for example by the publisher or duplicator of the recordings. In cases where it is desired to control viewing of material recorded privately, for example off-air or by camera, recording means for combining a classification code with the recorded program can be provided as well.

### BRIEF DESCRIPTION OF THE DRAWINGS

An embodiment of the present invention will now be described, by way of example only, with reference to the drawings in which:

FIG. 1 is a schematic block diagram of an embodiment of the invention which includes means for optionally recording classification and program;

FIG. 2 is a schematic diagram of the operational loop of the programme executed by the microcomputer of this embodiment;

FIG. 3 is a schematic diagram of the software used for selecting which classifications cause suspension or termination of playing;

FIG. 4 is a schematic diagram of the software used for overriding the suspension or termination function; and

FIG. 5 is a schematic block diagram of the software used for control of auxiliary devices.

### DETAILED DESCRIPTION

As seen in FIG. 1 this embodiment of the invention comprises the conventional components of a video recorder/player (commonly known as VCR), including record signal processor 2, replay signal processor 4, transport controller 9 and storage medium 3, which is typically a video cassette, but may also be a video disk or any other suitable storage medium.

The operation of this embodiment relies on the presence of a program classification code within the video signal. This can be provided in a number of well known ways which ensure that the presence of such codes do not interfere with the normal viewing of video programs. The method used in this embodiment is encoding of a digital word in the form of black and white transitions located on line 16 of the video signal. This position is chosen so as to be invisible on the CRT display. The technology for this form of signalling is well known, being commonly used for data broadcasting services such as Teletext.

For the purpose of recording a program and inserting a classification code for later use by the invention, clas-

4,930,158

**3**

sification code inserter 12 inserts a code, dictated by microcomputer 6, into line 16 of the video signal as it is recorded.

Classification detector 5 extracts line 16 from the replay signal, and presents the code found therein to an input of microcomputer 6.

Microcomputer 6 is self-contained "single chip computer" including RAM, ROM, IO ports, CPU and NV (non-volatile) memory. Microcomputer 6 may also perform many other functions required by the VCR, in addition to those specific to this invention. One of the output ports of microcomputer 6 controls transport controller 9. Other ports read data from keyboard 7 and send data to display 8.

Keyboard 7 is a press-button key array, which contains keys for control of all the usual VCR functions, as well as special keys used by this invention. The special keys include a SET CLASSIFICATION key, used for entering the classifications of undesired material, and an OVERRIDE key, used to disable the selective playing function and play a recording irrespective of classification. The channel selection keys commonly found on VCRs are used in this embodiment to serve the double purpose of allowing the user to enter a PIN (personal identity number). Similarly, the other keys of the VCR can serve double functions if desired.

Display 8 is used to signal the user as required. In this embodiment it comprises an eight character liquid crystal display. In other embodiments other forms of display can be used, including single LEDs or a video character generator which causes characters to be superimposed on the CRT display.

The selective viewing function of the invention is performed by the arrangement of FIG. 1 executing the program described schematically in FIG. 2 while a recordings is being played.

Referring now to FIG. 2, the program starts by scanning the keyboard to test for a key depression. If no key is pressed, the classification code, arriving from classification detector 5, is read, and an address is generated as a function of the code. A table is stored in the memory of microcomputer 6, the address of each data bit of the table corresponding to a unique classification code, and the state of each bit so addressed indicating the classification status, namely ENABLED or DISABLED. A set bit indicates DISABLED, while a clear bit indicates ENABLED. Having generated an address from the received code, microcomputer 6 then applies this address to the table, and tests the corresponding data bit. If the bit is set, microcomputer 6 signals transport controller 9 to stop replay. If the bit is clear, playing continues uninterrupted. This procedure is repeated as a loop at high speed, so that playing is quickly terminated on receipt of a classification code corresponding to undesired program content.

In order to allow authorised users to select whether a given classification code is to be enabled or disabled, the program of FIG. 2 also continually scans the keyboard, testing for depression of the SET CLASSIFICATION key. If this key is pressed, the SET CLASSIFICATION routine is performed, according to FIG. 3.

Referring now to FIG. 3, when the SET CLASSIFICATION key has been pressed, microcomputer 6 first requests, via display 8, that the user enter a PIN (personal identity number). A number is then input, in this embodiment three digits being used for security, and compared to the PIN stored in the NV memory of microcomputer 6. If the number does not match, the

**4**

request is repeated. If the number does match, the first classification group number is displayed, and the user is requested to enter enable or disable, using two designated keys of keyboard 7. If enable is entered, the first bit of the code array is cleared. If disable is entered, the bit is set. A test is then performed to see whether the whole array has been programed. If it has, control is returned to the operational loop, if not, the next array element is addressed, and the input cycle repeated for the next classification code.

In this embodiment the array comprises three bits, corresponding to the classifications:

1. Violent
2. Sexually explicit
3. Adult only

The coding scheme of this embodiment uses an eight bit word, so that up to 256 classifications can be supported. The 253 unused bits of the array are cleared, so that all classifications other than the three listed above are always playable. If desired, this range of classifications can be extended greatly, by increasing the size of the memory array.

When an authorised person, for example a parent, desires to watch a program of disabled classification, it may be inconvenient to re-define the classifications enabled. For convenience, this embodiment provides an override function, which is invoked by pressing the OVERRIDE key of keyboard 7. Depression of this key is detected by the test in the operational loop of FIG. 2, and results in the execution of the override routine of FIG. 4.

Referring to FIG. 4, on entry to the override routine, the PIN is requested from the user. If the PIN does not match the number stored in NV memory, the routine terminates. If the correct PIN has been entered, replay is started, and the program continues looping until the STOP key is pressed, with the result that replay continues until the STOP key is pressed, irrespective of classification.

The operation so far described assumes that the tape being played has been processed so that a classification code is included in the video signal. This is applicable, for example, to pre-recorded tapes which are available for rental, and which have been provided with suitable codes by the supplier. This will also occur if the broadcaster of a program being recorded off-air has included a suitable code in the transmission. In cases where a recording is made of a program which does not contain the code, it is possible, using this embodiment, to include a code in the recording, for subsequent use in restricting viewing.

One way this can be achieved is by entering a code, using keyboard 7, prior to or during recording. Microcomputer 6 sends the input code to classification code inserter 12, where the code is combined with the video signal being recorded. This mode is useful if, for example, a pornographic movie is being recorded off-air by a parent who desires that the children of the household will not be able to replay it.

Another way codes can be recorded is to receive them from a remote source, such as a station where broadcast programs are being monitored and appropriate classifications are being transmitted, In this case, the classification code arriving at classification code input 14 is received by classification receiver 13, which presents the received classification to an input of microcomputer 6. Microcomputer 6 then instructs classification inseter 12 to insert the current code into the recorded

4,930,158

5

signal. An application of this technique is to record programs and classifications in cases where classifications might change from time to time, or where the person operating the VCR is not present during the whole recording and is therefore not able to enter classifications manually.

The selective playing function described above is directed to simply terminating replay of a tape which is of a prohibited classification. This is a desirable capability if, for example, the objetive is to prevent children watching pornographic tapes. A further capability of the invention, directed to providing means for replacing unwanted program with programme from another source, will now be described.

Referring again to FIG. 1, microcomputer 6 is provided with auxiliary output 11 and auxiliary input 12, which are used under control of the programs shown schematically in FIG. 5 to provide substitution of alternative programme on detection of prescribed codes.

Referring now also to FIG. 5, on entry to the auxiliary control program, microcomputer 6 starts playing. The detected classification code, recovered from the recording, is then read, and unless the code is a code designated as "REPLACE", the process is repeated until the STOP key is pressed. If a REPLACE code is detected, a signal is sent to auxiliary output 11. On receipt of this signal, an auxiliary device, such as another VCR, responds by playing another recording, and an auxiliary switching device selects the substitute material to be displayed instead of the signal from replay signal output 10. Microcomputer 6 continues reading replayed codes from classification detector 5 until the REPLACE code is no longer detected, at which time microcomputer 6 suspends replay by issuing a suitable command to transport controller 9. The main program tape is now positioned beyond the material to be replaced and ready to resume playing the desired program. When the auxiliary device has finished replaying the substitute program, it sends a signal to auxiliary input 12, which is received by microcomputer 6 which causes replay of the first program to resume. In some cases it may be desirable to advance quickly through unwanted program carrying the REPLACE code, for example using the fast-forward or picture-search capabilities of the transport mechanism. An application of this substitution capability of this embodiment is replacing advertisements within a recorded program with alternative advertisements or information. In this case, the auxiliary device can be a VCR which plays a recording comprising a number of advertisements or messages, each of which is longer in duration than the material to be replaced, ensuring that the main program into which the alternative material is to be inserted resumes without interruption on receipt of the auxiliary input signal at the conclusion of the inserted segment. The main program can consist of a number of segments separated by advertisements to be substituted, carrying REPLACE code, or by short breaks of, say, black program carrying REPLACE code.

The foregoing describes only some embodiments of the invention and modifications, obvious to those skilled in the art, can be made without departing from the scope of the present invention.

For example, in cases where one of several available channels of broadcast program is being recorded prior to subsequent replay, and classification codes are being received from a remote source for combining with the program, it is desirable that each classification code

6

received be identified as relating to a particular channel, and only the code relating to the channel being recorded be combined with the recorded signal. This feature is easily added to the embodiments described, especially in cases where the keyboard and microcomputer of the invention are also used to control the channel selection functions of the television receiver.

Whereas the embodiment of the invention described above relies upon signals encoded into the video portion of the video program, the invention can also be effectively implemented using signals embedded into the audio portion of the program using any of the available well-known techniques which do not interfere with normal sound reception.

Whereas the embodiment described above uses control of the tape transport mechanism to inhibit playing, the invention can also be realised using other means of suppressing replay, for example, disabling the output signal without stopping tape motion.

The invention is also not limited to application with tape as the recording medium, being equally suited to use with video disk or any other video storage technique.

The classification code used by this invention can also be used to provide other useful additional functions, such as displaying the title of the program being played, locating a particular program on a videotape, or gathering data for audience research purposes.

What I claim is:

1. A video recording playing method comprising the steps of:

receiving, from a video storage medium, signals representative of a video program,

processing said signals to produce video signals of a form suitable for display,

detecting a classification code within the signals received from the storage medium, said detected code being indicative of a class of program being played,

inputting from the user a security code number, comparing the number input to a stored number and, if the numbers are equal, enabling selection of a set of classification codes which cause at least one of suspension or termination of playing,

comparing the detected code to said set of classification codes, and

selectively playing the video program according to the result of the comparison.

2. A video recording playing method according to claim 1 wherein a classification code has been previously transmitted along with a video program being broadcast, said program and code being stored on a storage medium which is subsequently replayed.

3. A video recording playing method according to claim 1, wherein the classification code forms part of the signal recorded on a video recording which is one of a number of duplicate recordings made available for acquisition by the public.

4. A video recording playing method according to claim 1, comprising the further steps of inputting from the user a code to be recorded along with a video program being recorded, inserting said code into the signal being recorded, recording the combined signals on a video storage medium, and replaying the recorded signal.

5. A video recording playing method according to claim 1, comprising the further steps of receiving a video program from a first source, receiving a classifica-

4,930,158

7

tion code from a second source, combining said code with said program, recording the combined signals on a video storage medium, and replaying the recorded signal.

6. A video recording playing method according to claim 1 and including the further step of transmitting to an auxiliary device a signal indicating the classification of program being replayed.

7. A video recording playing method comprising the steps of:

receiving, from a video storage medium, signals representative of a video program,

processing said signals to produce video signals of a form suitable for display,

detecting a classification code within the signals received from the storage medium, said code being indicative of a class of program being played,

comparing the detected code to a set of selected codes,

selectively playing the video program according to the result of the comparison, and

transmitting to an auxiliary device a signal indicating the classification of program being replayed.

8. A video recording playing method comprising the steps of:

receiving from a video storage medium signals representative of a video program,

processing said signals to produce video signals of a form suitable for display,

detecting a code within the signal received from the storage medium,

comparing the detected code to a set of selected codes, and, according to a predetermined result of the comparison:

sending a signal to an auxiliary device,

causing playing of the video program to be suspended,

waiting until a resumption signal is received, and resuming replay of the suspended program after receiving the resumption signal.

9. A method as in claim 8 comprising the further steps of inputting, from the user, a security code number, comparing the number input to a stored number, and if the numbers are equal, enabling selection of said set of selected codes.

10. A method as in claim 8 wherein said predetermined result of the comparison is one indicative of material substitution,

and further comprising the step of receiving and playing substitute program material from the auxiliary device until the resumption signal is received.

11. A method as in claim 10 further comprising the step of, during said predetermined comparison result and until said resumption signal is received, advancing playing the material using a fast forward function.

12. A video recording player which displays video on a video display means, comprising:

means for receiving, from a video storage medium, signals representative of a video program,

processing means for converting said signals into video signals of a form suitable for application to the video display means,

means for detecting a classification code within the signal received by the receiving means, said code being indicative of a class of program being played,

input means for accepting from the user a security code number;

8

enabling means for enabling selection of a set of classification codes which cause suspension or termination of playing, said enabling means enabling said selection only if the security code number input is the same as a stored security code number,

means for comparing the detected code to said set of classification codes, and

controller means for selectively playing the video program according to a result of the comparison.

13. A video recording player according to claim 12 including means for recording a video program transmitted from a remote location, said video program containing within the signal a classification code.

14. A video recording player according to claim 12, wherein the classification code forms part of the signal recorded on a video recording which is one of a number of duplicate recordings made available for acquisition by the public.

15. A video recording player according to claim 12, including means for inputting a code from the user, means for receiving video program from a remote source, means for combining said input code with said received program, and means for recording the combined signals on a video storage medium.

16. A video recording player according to claim 12, including means for receiving a video program from a first source, means for receiving a classification code from a second source, means for combining said code with said program, and means for recording the combined signals on a video storage medium.

17. A video recording player according to claim 12, including means for transmitting to an auxiliary device a signal indicating the classification of program being replayed.

18. A video recording player which displays video on a video display means, comprising:

means for receiving, from a video storage medium, signals representative of a video program,

processing means for converting said signals into video signals of a form suitable for application to the video display means,

means for detecting a classification code within the signal received by the receiving means, said code being indicative of a class of program being played,

means for comparing the detected code to a set of selected codes, and

controller means for selectively playing the video program according to a result of the comparison, and

means for transmitting to an auxiliary device a signal indicating the classification of program being played.

19. A video recording player comprising:

means for receiving, from a video storage medium, signals representative of a video program,

processing means for forming video signals of a form suitable for application to a video display means from said signals,

means for detecting a code within the signal received by the receiving means,

means for comparing the detected code to a set of selected codes, and

controller means for, according to the result of the comparison, sending a signal to an auxiliary device, to cause playing of the video program to be suspended, and responsive to a resumption signal to resume playing of the suspended program when the resumption signal is received.

4,930,158

9

**20.** A player as in claim 19 further comprising inputting means for inputting, from the user, a security code number, and

means for comparing the number input to a stored number, and if the numbers are equal, enabling selection of said set of selected codes.

**21.** A player as in claim 19 wherein said predetermined result of the comparison is one indicative of material substitution,

10

and further comprising means for receiving and playing substitute program material from the auxiliary device until the resumption signal is received.

**22.** A method as in claim 21 further comprising fast forward means for, during said predetermined comparison result and until said resumption signal is received, advancing playing the material using a fast forward function.

\* \* \* \* \*

# Exhibit "B"

US004930158C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (6501st)

# United States Patent
Vogel

(10) Number: **US 4,930,158 C1**
(45) Certificate Issued: **Nov. 4, 2008**

(54) SELECTIVE VIDEO PLAYING SYSTEM

(75) Inventor: Peter S. Vogel, Faulconbridge (AU)

(73) Assignee: Guardian Media Technologies Ltd., La Jolla, CA (US)

**Reexamination Request:**
No. 90/007,746, Oct. 13, 2005
No. 90/008,544, Jan. 31, 2007

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | 4,930,158 |
| Issued: | May 29, 1990 |
| Appl. No.: | 07/237,175 |
| Filed: | Aug. 29, 1988 |

(30) Foreign Application Priority Data

Sep. 2, 1987 (AU) ............................................. PI4107

(51) Int. Cl.
*G11B 27/10* (2006.01)
*H04N 7/16* (2006.01)

(52) U.S. Cl. ...................... 386/94; 348/E7.06; 380/202; 725/142; 725/28

(58) Field of Classification Search ........................ None
See application file for complete search history.

(56) References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,673,318 A | 6/1972 | Olsen | 178/5.8 R |
| 3,859,457 A | 1/1975 | Kirk | 178/5.1 |
| 3,919,462 A | 11/1975 | Hartung | 178/5.1 |
| 3,919,479 A | 11/1975 | Moon | 179/1 |
| 4,068,264 A | 1/1978 | Pires | 358/122 |
| 4,114,139 A | 9/1978 | Boyd | 340/147 |
| 4,215,366 A | 7/1980 | Davidson | 358/124 |
| 4,225,884 A | 9/1980 | Block | 358/122 |
| 4,229,765 A | 10/1980 | Sanger | 358/188 |
| 4,245,245 A | 1/1981 | Matsumoto | 358/122 |
| 4,266,098 A | 5/1981 | Novak | 179/5.5 |
| 4,280,139 A | 7/1981 | Mogi | 358/165 |
| 4,325,078 A | 4/1982 | Seaton | 358/117 |

| | | | |
|---|---|---|---|
| 4,331,974 A | 5/1982 | Cogswell | 358/86 |
| 4,333,110 A | 6/1982 | Faerber | 358/165 |
| 4,338,628 A | 7/1982 | Payne | 358/120 |
| 4,348,696 A | 9/1982 | Beier | 358/188 |
| 4,354,201 A | 10/1982 | Sechet | 358/122 |
| 4,375,651 A | 3/1983 | Templin | 358/191.1 |
| 4,386,436 A | 5/1983 | Kocher | 455/151 |
| 4,398,193 A | 8/1983 | Kuniyoshi | 340/825.76 |
| 4,425,579 A | 1/1984 | Merrell | 358/86 |
| 4,484,217 A | 11/1984 | Block et al. | 358/84 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 536261 B | 5/1982 |
| AU | 80145-82 | 10/1982 |
| AU | 56757-86 | 11/1986 |
| EP | A-0-053885 | 6/1982 |
| EP | 0112575 A1 | 12/1983 |
| EP | 0112575 B1 | 3/1986 |
| GB | 1424739 A | 2/1976 |
| GB | 8138341 | 6/1983 |
| GB | 2206759 A | 1/1989 |
| GB | 2206759 B | 1/1992 |
| JP | 59-210782 | 11/1984 |

OTHER PUBLICATIONS

Rae Atkey, "How You Can Censor Your Child's TV Viewing," The News Editiorial (Adelaide) Aug. 25, 1986.

*Primary Examiner*—Ovidio Escalante

(57) **ABSTRACT**

A classification code, recorded repeatedly along with program material, is recovered on playing a video recording, and used to inhibit replay if the recovered code matches any of a set of codes specified by the user. The codes which cause replay to be inhibited can be set by the user after entering a personal identity number. The user can optionally request that a code be recorded when recording a program. Signals are optionally provided so that an auxiliary device, such as a second video player, can be controlled in response to codes recovered. One application is to prevent children viewing certain video recordings without parental permission.



# US 4,930,158 C1
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,488,179 A | 12/1984 | Krüger | 358/181 |
| 4,510,623 A | 4/1985 | Bonneau | 455/181 |
| 4,520,404 A | 5/1985 | Von Kohorn | 358/355 |
| 4,528,588 A | 7/1985 | Löfberg | 358/122 |
| 4,528,589 A | 7/1985 | Block et al. | 358/122 |
| 4,530,008 A | 7/1985 | McVoy | 358/123 |
| 4,536,791 A | 8/1985 | Campbell | 358/122 |
| 4,554,584 A | 11/1985 | Elam et al. | 358/165 |
| 4,588,857 A | 5/1986 | Arsem | 179/6.06 |
| 4,591,664 A | 5/1986 | Freeman | 179/6.06 |
| 4,595,950 A | 6/1986 | Löfberg | 358/122 |
| 4,598,288 A | 7/1986 | Yarbrough | 340/825.34 |
| 4,599,647 A | 7/1986 | George | 358/122 |
| 4,600,921 A | 7/1986 | Thomas | 340/825.31 |
| 4,602,297 A | 7/1986 | Reese | 360/14.1 |
| 4,605,964 A | 8/1986 | Chard | |
| 4,605,973 A | 8/1986 | Von Kohorn | 358/335 |
| 4,620,229 A | 10/1986 | Amano et al. | |
| 4,670,857 A | 6/1987 | Rackman | 380/4 |
| 4,685,131 A | 8/1987 | Horne | 380/20 |
| 4,695,904 A | 9/1987 | Shinyagaito | 358/342 |
| 4,696,034 A * | 9/1987 | Wiedemer | 380/230 |
| 4,718,107 A | 1/1988 | Hayes | |
| 4,729,044 A | 3/1988 | Kiesel | 360/14.3 |
| 4,750,213 A | 6/1988 | Novak | 455/67 |
| 4,787,063 A | 11/1988 | Muguet | 364/900 |
| 4,814,883 A | 3/1989 | Perine | 358/181 |
| 4,888,796 A | 12/1989 | Olivo, Jr. | |
| 4,896,354 A | 1/1990 | Inagaki et al. | |
| 4,939,596 A | 7/1990 | Takayama | 360/27 |

* cited by examiner

US 4,930,158 C1

**1**

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 8–11 and 19–22 is confirmed.
Claims 1–7 and 12–18 are cancelled.

* * * * *

# Exhibit "C"

# United States Patent [19]

## Vogel

[11] Patent Number: **4,930,160**

[45] Date of Patent: May 29, 1990

[54] **AUTOMATIC CENSORSHIP OF VIDEO PROGRAMS**

[76] Inventor: Peter S. Vogel, 28 Adeline Street, Faulconbridge NSW 2776, Australia

[21] Appl. No.: 237,176

[22] Filed: Aug. 29, 1988

[30] **Foreign Application Priority Data**

Sep. 2, 1987 [AU] Australia ................................ PI4107

[51] Int. Cl.⁵ ............................................. H04K 1/00
[52] U.S. Cl. ........................................ 380/23; 358/84; 358/349; 455/2; 455/4; 380/20; 340/825.34
[58] Field of Search ...................................... 380/3–5, 380/23, 20; 364/200, 900, DIG. 545; 358/84, 86, 139, 908, 349; 455/2, 4–6, 67–70; 340/825.31, 825.34

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,859,457 | 1/1975 | Kirk, Jr. | 358/86 X |
| 3,919,479 | 11/1975 | Moon et al. | 358/84 X |
| 4,331,974 | 5/1982 | Cogswell et al. | 358/86 |
| 4,520,404 | 5/1985 | Von Kohorn | 358/84 X |
| 4,530,008 | 7/1985 | McVoy | 380/23 |
| 4,605,973 | 8/1986 | Von Kohorn | 455/4 X |
| 4,620,229 | 10/1986 | Amano et al. | 358/349 |
| 4,685,131 | 8/1987 | Horne | 358/86 X |
| 4,718,107 | 1/1988 | Hayes | 455/4 |
| 4,750,213 | 6/1988 | Novak | 455/67 |
| 4,814,883 | 3/1989 | Perine et al. | 358/84 X |

*Primary Examiner*—Stephen C. Buczinski
*Assistant Examiner*—Bernarr Earl Gregory

[57] **ABSTRACT**

A video program is received from a broadcast or video recording and displayed for viewing. On receipt of a prescribed classification code or group of codes display is switched to an alternative source. The classification code can be encoded into the broadcast or tape being viewed, or can originate from a separate source. The alternative material displayed can be another broadcast, a local recording, a locally-generated pattern, or other material. The codes which cause the display to be switched to the alternative source can be set by the user after entering a personal identity number.

**26 Claims, 5 Drawing Sheets**





Fig. 1



Fig. 2



Fig. 3



Fig. 4



Fig. 5

4,930,160

**1**

## AUTOMATIC CENSORSHIP OF VIDEO PROGRAMS

### FIELD OF THE INVENTION

The present invention relates to methods of, and apparatus for, automatic censorship of video programs. The term video program used hereinafter refers to television programs broadcast free-to-air or by cable or by satellite, and other forms of mass distribution of video programs, including distribution by video tape or other media. The term also includes an accompanying audio signal if any.

### BACKGROUND OF THE INVENTION

The need for censorship of video material is generally accepted by most societies, for the purposes of preventing the viewing of material by persons other than the target audience. Usually, such censorship takes the form of limiting access of a certain group of people, for example children, to a certain class of material, for example pornographic or violent movies. Other uses of censorship include voluntary self-censorship in cases where a recipient of a program does not wish to be exposed to certain types of program, for example scenes of great violence, advertisements which may be considered offensive, or non-program material which interrupts movies, drama or sports broadcasts.

Being the most widely accessible form of broadcasting, television is the medium with which the problem of censorship is experienced most. Traditionally, censorship of television takes the form of either preventing possibly offensive material from being broadcast in the first place, or voluntary self-censorship, that is, switching off the receiver when material which the viewer does not wish to experience is broadcast. Another form of self-censorship, which has gained popularity since the introduction of remote controls for television sets is the phenomenon known as "zapping". Zapping involves eliminating unwanted material by muting the receiver or changing channels for the duration of the unwanted segment. While such self-censorship offers the benefit that all classes of material remain available to those who do not find them objectionable, it suffers from the inconvenience of having to anticipate the nature of broadcasts and operate the receiver appropriately. This process is tedious and error-prone, especially where the viewer wishes to suppress program material which changes rapidly in nature, for example when the viewer desires to suppress commercial messages within an otherwise unobjectionable program. Manual censorship is therefore not an entirely satisfactory solution.

It is therefore desirable to provide means whereby display of preselected classifications of program material can be automatically suppressed.

Arrangements for automatic censorship have been previously published, but suffer from a number of serious shortcomings. The main difficulty is that automatic means for discrimination of different program classifications, for example detection of television commercials, have been complex and unreliable. One technique has been to detect television commercials by the short period of black picture and silence separating them from other program material. A typical commercial-deleter of this type is described in U.S. Pat. No. 4,319,286. This system and others like it suffer from the problem that erroneous operation occurs if there is a brief period of black and silence in a broadcast at a time other than at

**2**

the beginning of a commercial break, or if there is no separation between commercials and other program material. Furthermore, such systems are unable to distinguish between resumption of desired program and further commercials at the conclusion of a commercial. Resumption of viewing or recording must therefore be controlled by some form of timing device, based on assumptions regarding the length of commercial breaks. If these assumptions are not correct, the system will fail in its function.

A much improved censorship means is described in U.S. Pat. No. 4,520,404. This system relies on a human operator to classify broadcasts, based on observation at a monitoring station. A suitably coded message is distributed from the monitoring station to the viewer's home, at which point a suitably-equipped decoder controls the television receiver or video recorder in accordance with the classification data generated by the human operator at the monitoring station. Although this invention significantly improves upon the reliability of previous methods, it nevertheless suffers significant limitations. One limitation is the difficulty of accurately predicting at the monitoring station when a change of program is going to occur, making the system somewhat error prone. Another limitation is that when the system is used under the control of one party to control the viewing of another party, for example used by parents to limit viewing by children, it is necessary to provide control means by which the class of program to be censored can be selected, and it is therefore possible for the other party to use these controls to disable the censorship, thereby defeating the function of the system. Yet another limitation is that during the period that unwanted material is being censored, the receiver is simply disabled. The viewer is therefore periodically presented with a blank screen and/or silence, which may have the undesirable effect of causing alarm when program suddenly resumes, or may be mistaken for a receiver malfunction.

The prior art methods are also deficient in that they do not provide means whereby an authorized person can selectively disable viewing of certain classifications of pre-recorded video programs.

### SUMMARY OF THE INVENTION

The present invention is directed to providing novel and improved means and method of receiving video programs whereby the censorship function is provided automatically, substantially resolving the abovementioned shortcomings of the prior art as well as providing other benefits.

According to a first aspect of the present invention, there is provided a video program receiving method capable of automatically censoring video programs comprising the steps of receiving a video program, with accompanying audio if any, receiving a classification signal indicative of the content of the program being received, decoding the classification signal and, according to functions selected by the user, causing the receiver to direct to its output alternative program material for the duration of program of selected classification.

According to a second aspect of this inventive concept, apparatus for receiving and automatically censoring video program is also provided, and comprises a video program receiver, a classification signal receiver, a controller equipped to decode said received signal and

4,930,160

**3**

to control switching means which, according to functions selected by the user at the receiving station, cause the receiver to direct to its output alternative program material for the duration of program of selected classification.

The term "receiver" used herein is defined in the broad sense of apparatus for converting television signals (and their associated sound signals) into visual and audible signals, or apparatus for converting modulated carrier signals into video and/or audio signals suitable for display by video monitors or audition via amplifiers and loudspeakers. For example, the term receiver includes off-air domestic television sets, as well as apparatus known commonly as a "video monitor". The term "receive" is used in the broad sense of accepting signal from any signal conveyance means, for example, from an antenna, cable, optical fiber, magnetic tape, or optical disk.

Some embodiments of this invention also include an arrangement for enabling access to selection of classifications known as a "video monitor". The term cations to be censored only upon entering of a security code, or personal identification number (PIN), by the user.

## BRIEF DESCRIPTION OF THE DRAWINGS

Some embodiments of the present invention will now be described, by way of example only, with reference to the drawings in which:

FIG. 1 is a schematic block diagram of a first embodiment of the invention in which the program classification is encoded into the vertical interval of the video signal;

FIG. 2 is a schematic diagram of the operational loop of the program executed by the microcomputer of the first embodiment;

FIG. 3 is a schematic diagram of the software used in either embodiment for setting classifications;

FIG. 4 is a schematic diagram of the software used in either embodiment for overriding the censorship function; and

FIG. 5 is a schematic block diagram of a second embodiment of the invention in which the program classification is received by the invention from a transmission source other than the program to be censored.

## DETAILED DESCRIPTION

As seen in FIG. 1 this embodiment of the invention comprises the conventional components of a television receiver or monitor, including audio amplifier 11, loudspeaker 12, CRT driver 10 and CRT 13. Under normal conditions, the sources of video and audio are selected from video input 3 and audio input 1 respectively. However when the selector means, relay 7 is energized, alternate audio input 2 and alternate video input 4 are selected instead. Both sets of audio and video inputs may derive from any source, for example a television tuner or video tape player.

The operation of this embodiment relies on the presence of a program classification code within the video signal. This can be provided in a number of well known ways which ensure that the presence of such codes do not interfere with the normal operation of television receivers. The method used in this embodiment is encoding of a digital word in the form of black and white transitions located on line 16 of the video signal. This position is chosen so as to be invisible on the CRT display. The technology for this form of signalling is well known, being commonly used for data broadcasting

**4**

services such as Teletext. The classification may be pre-recorded on tapes being broadcast or played locally, or inserted in a video signal prior to transmission at the broadcasting station at the time of broadcast. The means for inserting such signals is well known.

Upon arrival at video input 3 of the invention, as well as being fed to the display system, the video portion of the program is fed to line code extractor 5, which comprises means for isolating the desired line (in this embodiment line 16), extracting the digital word from that line, and presenting it as an output readable by microcomputer 6.

Microcomputer 6 is a self-contained "single chip computer" including RAM, ROM, IO ports, CPU and NV (non-volatile) memory. Of course, microcomputer 6 may also perform many other functions required by the receiver, as well as those of this invention. One of the output ports of microcomputer 6 controls relay 7. Other ports read data from keyboard 8 and send data to display 9.

Keyboard 8 is a press-button key array, which contains keys for control of all the usual television functions, as well as special keys used by this invention. The special keys include a SET CLASSIFICATION key, used for entering the classifications to be censored, an OVERRIDE key, used to disable the censorship function, and a RESUME key, used to resume censorship after OVERRIDE. The usual channel selection keys of the receiver of this embodiment serve the double purpose of allowing the user to enter a PIN (personal identity number). Similarly, the other keys can serve double functions if desired.

Display 9 is used to signal the user as required. In this embodiment it comprises an eight character liquid crystal display. In other embodiments other forms of display can be used, including single LEDs, or a video character generator which causes characters to be superimposed on the CRT display.

The censorship function of the invention is performed by the arrangement of FIG. 1 executing the program described schematically in FIG. 2.

Referring now to FIG. 2, the program starts by scanning the keyboard to test for a key depression. If no key is pressed, the classification code, arriving from line code extractor 5, is read, and an address is generated as a function of the code. A table is stored in the RAM of microcomputer 6, the address of each data bit of the table corresponding to a unique classification code, and the state of each bit so addressed indicating the classification status, namely ENABLED or DISABLED. A set bit indicates DISABLED, while a clear bit indicates ENABLED. Having generated an address from the received code, microcomputer 6 then applies this address to the table, and tests the corresponding data bit. If the bit is set, relay 7 is energized, causing the video and audio signals to be switched to the alternate sources. If the bit is clear, relay 7 is released, with the opposite effect. This procedure is repeated as a loop at high speed, so that the operation of relay 7 follows instantaneous changes in classification codes arriving at the video input of the invention.

In order to allow authorized users to select whether a given classification code is to be enabled or disabled, the program of FIG. 2 also continually scans the keyboard, testing for depression of the SET CLASSIFICATION key. If this key is pressed, the SET CLASSIFICATION routine is performed, according to FIG. 3.

4,930,160

5

Referring now to FIG. 3, when the SET CLASSIFI-CATION key has been pressed, microcomputer 6 first requests, via display 9, that the user enter the PIN. A number is then input, in this embodiment three digits being used for security, and compared to the PIN stored in the NV memory of microcomputer 6. If the number does not match, the request is repeated. If the number does match, the first classification group number is displayed, and the user is requested to enter enable or disable, using two designated keys of keyboard 8. If enable is entered, the first bit of the code array is cleared. If disable is entered, the bit is set. A test is then performed to see whether the last element of the array has been programmed. If it has, control is returned to the operational loop, if not, the next array element is addressed, and the input cycle repeated for the next classification code.

In this embodiment the array comprises three bits, corresponding to the classifications:

1. Advertisement (commercial product or service promotion)
2. Non-program material (includes advertisements, station identification, community service announcements, commentary during movies etc.)
3. Restricted. Programs deemed by the government censors to be unsuitable for viewing by children.

The coding scheme of this embodiment uses an eight bit word, so that up to 256 classifications can be supported. The 253 unused bits of the array are cleared, so that all classifications other than the three listed above are always enable. If desired, this range of classifications can be extended greatly, by increasing the size of the memory array.

When an authorized person, for example a parent, desires to watch a program of disabled classification, it may be inconvenient to re-define the classifications enabled. For convenience, this embodiment provides an override function, which is invoked by pressing the OVERRIDE key of keyboard 8. Depression of this key is detected by the test in the operational loop of FIG. 2, and results in the execution of the override routine of FIG. 4.

Referring to FIG. 4, on entry to the override routine, the PIN is requested from the user. If the PIN does not match the number stored in NV memory, the routine terminates. If the correct PIN has been entered, relay 7 is released, and the program continues looping until the RESUME key is pressed, with the result that no censoring action occurs until the RESUME key is pressed.

A second embodiment of the invention is shown in FIG. 5. This embodiment is similar to the first embodiment, except that classification codes are received from a source separate from the source of video program. In this case, classification receiver 14 is provided to receive classification signal input 15, which can arrive from any source, for example a radio transmitter distinct from the transmitter broadcasting the video program. This embodiment of the invention is not suited to operation with prerecorded tapes as program source. Operation of this embodiment is the same as the first embodiment, except that classification codes are read from classification receiver 14, rather than line code extractor 5, by microcomputer 6. The software executed by microcomputer 6 is also the same. The capabilities of both embodiments could easily be combined.

The foregoing describes only some embodiments of the present invention, and modifications, obvious to

6

those skilled in the art, can be made without departing from the scope of the present invention.

For example, in cases where a broadcast program is being viewed, more than one channel of broadcast is available, and the classification signal is being received from a source other than the broadcast being received, it is desirable that each classification code received be identified as relating to a particular channel, so that censorship can be based on which channel is being viewed or recorded. This feature is easily added to the embodiments described, especially in cases where the keyboard and microcomputer of the invention are also used to control the channel selection functions of the television receiver.

For the purpose of implementing the invention without needing to modify the television receiver, the invention can comprise a standard television receiver in combination with a special controller which controls operation of the receiver by means of the remote control interface of the television receiver, if the receiver is equipped with remote control. That is, the censorship controller is equipped with interface means compatible with the remote control communication standard, for example an infra-red transmitter, so muting, blanking, channel-changing, or other censorship actions can be effected using unmodified receiving equipment. The channel-change function can provide the facility of displaying alternative material during periods of censorship. For example, a suitable pattern generator tuned to an unused television channel could be used to provide "electronic wallpaper" during commercial breaks. In some applications it may be desirable to implement some functions of the invention, such as PIN entry, in the remote controller, and other functions, such as the censorship function, in the receiver.

Whereas the switching means of the embodiments described herein is a relay, any form of suitable switch, such as a solidstate arrangement, can be used.

The alternative material selected during censorship periods can originate from a remote source, for example another television broadcast, or locally, for example from a video disk or tape player. The local source may also be simply a black signal generator. Furthermore, the invention is not limited to providing only one alternative program source.

Whereas one embodiment of the invention described above relies upon signals encoded into the video portion of the received program, the invention can also be effectively implemented using signals embedded into the audio portion of the program, using any of the available well-known techniques which do not interfere with normal sound reception.

What I claim is:

1. A video program reception method comprising the steps of:

    storing in memory means a set of codes descriptive of video program classifications,

    receiving a video signal and associated audio signal if present,

    receiving a program classification code descriptive of said video signal,

    accessing said memory means and comparing the contents thereof with said code, and,

    if the result of said comparison indicates that the received program is to be displayed, causing the received video signal to be selected for display,

    if the result of said comparison indicates that an alternative video signal is to be displayed, causing an

7

8

alternative source of video signal to be selected for display; and

displaying the selected video signal on a video display means.

2. A video program reception method according to claim 1, wherein the alternative source of video signal originates from a remote transmitter.

3. A video program reception method according to claim 1, wherein the alternative source of video signal is local to the receiving station.

4. A video program reception method according to claim 1, comprising the further steps of:

inputting from the user a personal identity number,

comparing said number to a stored number, and if said numbers are equal,

permitting the user to alter the codes stored within said memory means.

5. A video program reception method according to claim 4, wherein the alternative source of video signal originates from a source remote to the receiver.

6. A video program reception method according to claim 4, wherein the alternative source of video signal is local to the receiving station.

7. A video program reception method according to claim 6, wherein the alternative source of video signal is a local video pattern generator equipped to generate at least a black pattern.

8. A video program reception method according to claim 4, wherein the program classification code is encoded into the video component of the program.

9. A video program reception method according to claim 4, wherein the program classification code is encoded into the audio component of the program.

10. A video program reception method according to claim 4, wherein the program classification code is not encoded into the program being received but is received from a separate source.

11. A video program reception method according to claim 1, wherein the program classification code is encoded into the video component of the program.

12. A video program reception method according to claim 1, wherein the program classification code is encoded into the audio component of the program.

13. A video program reception method according to claim 1, wherein the program classification code is not encoded into the program being received but is received from a separate source.

14. A video program receiver comprising:

a video signal receiver,

a program classification code receiver,

a program classification code memory,

means for accessing said memory and comparing the contents thereof with received codes,

selector means equipped to cause a received video signal to be selected for display if the result of said comparison indicates that the received program is to be displayed and to cause an alternative source of video signal to be selected for display if the result of said comparison indicates that an alternative video signal is to be displayed, and

means for displaying the selected video signal.

15. A video program receiver according to claim 14, wherein the alternative source of video signal originates from a remote transmitter.

16. A video program receiver according to claim 14, wherein the alternative source of video signal is local to the receiving station.

17. A video program receiver according to claim 14, further comprising:

means for inputting from the user a personal identity number,

means for comparing said number to a stored number, and control means permitting the user to alter the contents of said memory only if the compared numbers are equal.

18. A video program receiver according to claim 17, wherein the alternative source of video signal originates from a source remote to the receiver.

19. A video program receiver according to claim 17, wherein the alternative source of video signal is local to the receiving station.

20. A video program receiver according to claim 19, wherein the alternative source of video signal is a local video pattern generator equipped to generate at least a black pattern.

21. A video program receiver according to claim 17, including means for deriving the program classification code from the video component of the program.

22. A video program receiver according to claim 17, including means for deriving the program classification code from the audio component of the program.

23. A video program receiver according to claim 17, including means for receiving program classification code from a source other than the program being received.

24. A video program receiver according to claim 14, including means for deriving the program classification code from the video component of the program.

25. A video program receiver according to claim 14, including means for deriving the program classification code from the audio component of the program.

26. A video program receiver according to claim 14, including means for receiving program classification code from a source other than the program being received.

* * * * *

# Exhibit "D"

US 4,930,160 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 3, 6, 7, 16, 19 and 20 is con-
firmed.

Claims 1–2, 4–5, 8–15, 17, 18 and 21–26 are cancelled.

*     *     *     *     *

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Charles Eick.

The case number on all documents filed with the Court should read as follows:

## CV09- 2733 DSF (Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUARDIAN MEDIA TECHNOLOGIES, LTD.<br><br>v.<br><br>APEX DIGITAL, INC., . . .<br><br>*SEE ATTACHMENT* | CASE NUMBER<br><br>~ **CV09-02733** DSF (Ex) |
| | |

PLAINTIFF(S)

DEFENDANT(S).

**SUMMONS**

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Edward E. Casto, Jr._____, whose address is _5601 Bridge Street, Suite 300; Fort Worth, Texas 76112_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: **APR 2 0 2009**

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

APEX DIGITAL, INC.; AT&T, INC.;
BENQ AMERICA CORPORATION;
DIGITAL PRODUCTS
INTERNATIONAL; FUJITSU
COMPUTER SYSTEMS
CORPORATION; FUJITSU
LIMITED; HAIER AMERICA
TRADING, LLC; HISENSE USA
CORPORATION; HYUNDAI IT
AMERICA CORP.; KONKA GROUP
CO., LTD.; LASONIC
ELECTRONICS CORPORATION;
LODGENET INTERACTIVE
CORPORATION; LOEWE AG; ON
CORP US; PROTON
INTERNATIONAL AMERICA, INC.;
PROTRON DIGITAL
CORPORATION; THE ROTEL CO.,
LTD; RUNCO INTERNATIONAL.

LLC; STARLITE CONSUMER
ELECTRONICS (USA) INC.;
STARLITE INTERNATIONAL
HOLDINGS, LTD., SKYWORTH
ELECTRONICS, INC.; SOYO, INC.;
TATUNG COMPANY OF
AMERICA, INC.; VERIZON
COMMUNICATIONS, INC.;
ZIAMEN OVERSEAS CHINESE
ELECTRONIC COMPANY,

          Defendants.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>GUARDIAN MEDIA TECHNOLOGIES, INC. | DEFENDANTS<br>APEX DIGITAL, INC. , et al. |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>Gregor A. Hensrude, Esq.; Klinedinst PC<br>777 South Figueroa 47th Floor<br>San Diego, CA 90017; 213-607-2115 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No   ☑ **MONEY DEMANDED IN COMPLAINT:** $ According to proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | Vacate Sentence Habeas Corpus | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty ☐ 540 Mandamus/ | Disclosure Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & | ☐ 340 Marine | BANKRUPTCY | Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt | Enforcement of Judgment | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights ☐ 555 Prison Condition | ☐ 790 Other Labor Litigation |
| Organizations | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 | FORFEITURE/ | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. | ☐ 355 Motor Vehicle Product Liability | USC 157 | PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | Veterans) | ☐ 360 Other Personal | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of | Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☑ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment ☐ 443 Housing/Acco- | ☐ 625 Drug Related | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | mmodations ☐ 444 Welfare | Seizure of Property 21 USC | SOCIAL SECURITY ☐ 861 HIA (1395ff) |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal | ☐ 445 American with | 881 | ☐ 862 Black Lung (923) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | Injury Product Liability | Disabilities - Employment | ☐ 630 Liquor Laws ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | ☐ 446 American with | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- | ☐ 440 Other Civil | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | Alien Detainee | Rights | | ☐ 870 Taxes (U.S. Plaintiff |
| ☐ 900 Appeal of Fee Determi- nation Under Equal | ☐ 230 Rent Lease & Ejectment ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | or Defendant) ☐ 871 IRS-Third Party 26 |
| Access to Justice | ☐ 245 Tort Product Liability | | | | USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | |

# CV09-02733

FOR OFFICE USE ONLY:   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

| CV-71 (05/08) | CIVIL COVER SHEET | Page 1 of 2 |
|---|---|---|

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑Yes
If yes, list case number(s): CV08-08439 R; CV09-00052 R

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
        ☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
        ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
        ☑ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Texas |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| See attached list | See attached list |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| All, including Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date April 17, 2009

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

*Guardian Media Technologies, Ltd v. Apex Digital, Inc.*

IX. Venue (b)

| Corporation: | State, County |
|---|---|
| Apex Digital, Inc. | California, Los Angeles County |
| AT&T, Inc. | Texas |
| BenQ America Corporation | California, Orange County |
| Digital Products International | Missouri |
| Fujitsu Computer Systems Corporation | California, Santa Clara County |
| Fujitsu Limited | Japan |
| Haier American Trading, LLC | New York |
| Hisense USA Corporation | Georgia |
| Hyundai IT America Corp. | California, Santa Clara County |
| Konka Group Co., Ltd. | China |
| Lasonic Electronics Corporation | California, Los Angeles County |
| LodgeNet Interactive Corporation | South Dakota |
| Loewe AG | Germany |
| On Corp US | Indiana |
| Proton International America, Inc. | California, Los Angeles County |
| Protron Digital Corporation | California, San Bernardino County |
| The Rotel Co., Ltd. | Japan |
| Runco International, LLC | Oregon |
| Starlite Consumer Electronics | Hong Kong |
| Starlite International Holdings, Ltd. | Hong Kong |
| Skyworth Electronics, Inc. | California, Los Angeles County |
| Soyo, Inc. | California, San Bernardino County |
| Tatung Company of America, Inc. | California, Los Angeles County |
| Verizon Communications, Inc. | New York |
| Xiamen Overseas Chinese Electronic Company | China |